E-FILED
Tuesday, 12 October, 2021  02:52:17 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## PEORIA DIVISION

| | | |
|---|---|---|
| LAURA MCBRIDE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:18-cv-1424 |
| | ) | |
| CARLA BARNES, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Pending before the Court is Defendant Carla Barnes's Motion for Summary Judgment. ECF No. 45. Plaintiff filed a response and Defendant filed a reply. Accordingly, this motion is ripe for review. For the reasons stated below, Defendant's Motion for Summary Judgment is DENIED.

## PROCEDURAL BACKGROUND

In November of 2018, Plaintiff filed a Complaint against Defendant Carla Barnes and the now dismissed Defendants Bill Wasson and McLean County. She initially filed a *pro se* Complaint and later retained an attorney who filed an Amended Complaint. Plaintiff's claims relate to the elimination of her position in 2017. The Amended Complaint named the same Defendants as the *pro se* Complaint and claimed: (1) a First Amendment violation under 42 U.S.C. § 1983 against Barnes and Wasson; (2) a First Amendment conspiracy under 42 U.S.C. § 1983 against Barnes and Wasson; (3) a section 1983 *Monell* claim for violation of Plaintiff's First Amendment rights against all Defendants; and (4) a violation of the Illinois Whistleblower Act, 730 ILCS 174/20.1, against all Defendants. Defendants filed a Motion to Dismiss Plaintiff's Amended Complaint under Federal Rule of Civil Procedure 12(b)(6). ECF No. 17. The Court dismissed all the claims

1

against Bill Wasson and McLean County and Counts Two and Three against Defendant Barnes. The only remaining claims are Count One brought under the First Amendment and Count Four under the Illinois Whistleblower Act against Defendant Barnes. The parties exchanged discovery and Defendant Barnes filed a Motion for Summary Judgment. This opinion follows.

## FACTUAL BACKGROUND

This action stems from the December 31, 2017 termination of Plaintiff's employment as a Criminal Defense Investigator in the Public Defender's Office. Plaintiff contends that Defendant Barnes made the decision to terminate Plaintiff by using the pretext of budgetary concerns after Plaintiff spoke out on how former Public Defender Kim Campbell ("Campbell") may have improperly aided the prosecution in the murder trial of *People v. David Boswell, Jr.*, 2010 CF 1117 and of how Defendant Barnes, lead trial counsel for Boswell and later, the Public Defender, failed to report Campbell's actions from that trial. ECF No. 46 at 50.

Plaintiff points to August 2011 as the precipitation of events that ultimately led to her termination. In August 2011, Plaintiff testified in a professional capacity in the *Boswell* trial. ECF No. 46 at 4. Defendant Barnes was lead counsel for Boswell, and Campbell was Defendant's supervisor. After closing arguments, Campbell allegedly told Plaintiff that she had helped the Assistant State's Attorney write her closing argument. ECF No. 50 at 7. Boswell, the criminal defendant, was found guilty. Plaintiff reported Campbell's statement to Defendant Barnes, who noted that she had suspected that Campbell was assisting the prosecutors, but nonetheless declined to report Campbell. *Id*. at 7–8. Defendant Barnes told Plaintiff that she discussed it with co-counsel Brian McEldowney the same day and the two agreed that they did not need to report the information. *Id*. at 8.

It appears that information remained private until 2014. In April 2014, Plaintiff met with the McLean County State's Attorney due to concerns that Campbell was improperly using public funds and resources. ECF No. 46 at 5. Plaintiff ultimately brought her concerns to Chief Judge Elizabeth Robb. On July 22, 2014, Plaintiff met with Chief Judge Robb and also told her about Campbell's involvement with the Boswell trial and Defendant Barnes's knowledge of it. ECF Nos. 46 at 5; 50 at 2. In September 2014, Plaintiff signed an affidavit prepared by Judge Robb regarding the *Boswell* trial and included in that affidavit that she reported the incident to Defendant Barnes. ECF Nos. 45-6; 46 at 20. The parties appear to agree that Defendant Barnes was aware of the contents of the affidavit, specifically that Plaintiff claimed that Defendant knew of Campbell's misconduct in the *Boswell* case and chose not to report it. ECF No. 46 at 6.

Campbell was eventually ousted from office due to the scandal involving her misappropriation of funds. ECF No. 45 at 5. It appears that at that time, Campbell and Defendant Barnes's misconduct regarding the *Boswell* trial was still not publicly known. In 2014, Defendant Barnes was selected to serve as the new McClean County Public Defender. ECF No. 46 at 7. When Defendant was promoted, she and Plaintiff were still good friends in addition to being colleagues. ECF No. 46 at 24. Defendant Barnes, in fact, stood up in Plaintiff's 2007 wedding and Plaintiff claims they continued to be friends long after Defendant was appointed to McLean County Public Defender and became the boss of the office. *Id*. The two vacationed together as recently as February 2016. *Id*.

However, in March of 2016, Plaintiff's accusations regarding Campbell's inappropriate conduct in the *Boswell* trial became public in a newspaper article published in *The Pantagraph*. ECF No. 45-7. The article outlined how the defendant in the *Boswell* trial was seeking a new trial due to Campbell's misconduct. *Id*.  While Defendant was not mentioned in the article, the article

referenced the affidavit where Plaintiff claimed she had informed Defendant of Campbell's misconduct. *Id.* Plaintiff claims that shortly after the article was published, Defendant stated that she was worried about the future of her career. ECF No. 45-1 at 21. Plaintiff testified that Defendant felt concern about the affidavit being available and that it contained information that Defendant knew about Campbell's misconduct since the trial had ended. ECF No. 45-1 at 21. Defendant also admits that while she was on vacation, she received a call from the author of *The Pantagraph* article but that she had missed the call. ECF Nos. 50 at 100; 45-1 at 20. Plaintiff argues that Defendant was a young lawyer with ambitions to higher office and would be unhappy to have her participation in this conflict of interest play out in the press and in public court proceedings. ECF No. 46 at 40. She states that Defendant's fears were eventually realized in an Illinois Appellate Court opinion in the *Boswell* postconviction proceedings where the Appellate Court stated that Plaintiff's affidavit supported an inference that "there was a defect in Barnes's decision-making that was attributable to her conflicting loyalties to defendant and her employer." *People v. Boswell*, 2020 IL App (4th) 180165, ¶ 26, 2020 WL 7654079, at *5 (Ill. App. 4 Dist., 2020). Accordingly, the Illinois Appellate Court agreed that Defendant Barnes had an actual conflict of interest and granted Boswell an evidentiary hearing on his conflict-of-interest claim. *Id.*

Plaintiff claims that after the article, her once warm friendship and professional relationship with Defendant turned tense. ECF No. 45-1 at 22. Plaintiff claims that Defendant stopped speaking to her about personal matters, they stopped texting, and they stopped communicating as much in the office. *Id.* If they needed to communicate about work, Defendant would generally leave Plaintiff a note in her bin. *Id.* Plaintiff claims that her relationship with Defendant progressively deteriorated after the article and that over time, Defendant reassigned her work, minimized her role and responsibilities, undermined Plaintiff to the attorneys in the office, made it more difficult

4

for attorneys to work with Plaintiff, stopped inviting Plaintiff to meetings and seminars she would have previously attended, and other retaliatory actions. *Id*. at 22–25. Defendant even assigned the social worker the task of serving subpoenas. *Id*. at 24. Plaintiff interprets Defendant's conduct as retaliation. Plaintiff claims Defendant knew she could not outright fire an employee with a stellar reputation and thus, engaged in a campaign of smaller retaliation.

Plaintiff claims that Defendant's retaliation culminated in Defendant choosing Plaintiff's position for elimination in October 2017, when there was a reduction in force due to budget cuts. Plaintiff argues that there were other jobs that should have been cut and that would have impacted the functioning of the office less. Other attorneys agree that Defendant did not ask for input and did not appear to consider eliminating other positions. ECF Nos. 46-1, 46-2. Plaintiff also claims that Defendant not offering her the contract position and asking her to leave the office before her tenure was over, further supports her position that Defendant's decision was retaliatory.

## LEGAL STANDARD

Summary judgment is appropriate where the movant shows, through "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations ... admissions, interrogatory answers, or other materials" that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. In resolving a motion for summary judgment, "[t]he court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

To withstand a motion for summary judgment, the nonmovant must "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). When presented with a motion for summary judgment, the Court must construe the record

"in the light most favorable to the nonmovant and avoid[] the temptation to decide which party's version of the facts is more likely true." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). If the evidence, however, is "merely colorable, or is not significantly probative or merely raises 'some metaphysical doubt as the material facts,' summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50. Thus, in order to overcome the undisputed facts set forth in a defendant's motion for summary judgment, a plaintiff cannot rest on the allegations in his complaint but must point to affidavits, depositions or other evidence of an admissible sort that a genuine dispute of material fact exists between parties. Fed. R. Civ. P. 56(e)(2); *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996).

## ANALYSIS

### A. Defendant is not entitled to Summary Judgment on Count I: First Amendment violation under 42 U.S.C. § 1983.

### i. Plaintiff supports her position that she engaged in protected activity and suffered a deprivation that was motivated by her protected speech.

Defendant argues that she is entitled to Summary Judgment on Count I: First Amendment violation under 42 U.S.C. § 1983. Generally, First Amendment protection of lawsuits by public officials is limited to lawsuits in which the official "is speaking 'as a citizen on a matter of public concern.'" *Hagan v. Quinn*, 84 F. Supp. 3d 826, 830 (C.D. Ill. 2015) (citing *Borough of Duryea v. Guarnieri*, 564 U.S. 379 (2011); *Zorzi v. County of Putnam*, 30 F.3d 885, 896–97 (7th Cir. 1994)). Additionally, a plaintiff must allege that: (1) she engaged in activity protected by the First Amendment; (2) she suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the protected activity or speech was at least a motivating factor for the deprivation. *See Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008).

In the instant case, Defendant appears to concede that Plaintiff was speaking as a citizen. The Court agrees that the facts presented support that Plaintiff was acting as a citizen and not

6

pursuant to her official Criminal Defense Investigator duties when she reported her concerns. Furthermore, Plaintiff presents evidence to support a finding that the matters she was speaking out on were of a public concern; they were reported to the Attorney General's office, Chief Judge Robb, and *The Pantagraph* published a story about it. "The public concern element is satisfied if the speech can fairly be said to relate to a matter of political, social, or other concern to the community, rather than merely a personal grievance of interest only to the employee." *Gustafson v. Jones*, 290 F.3d 895, 907 (7th Cir. 2002) (citing *Connick v. Myers*, 461 U.S. 138, 146 (1983)).

Plaintiff also supports her assertion that she suffered a deprivation that was likely to deter First Amendment speech. According to Plaintiff, after she spoke out, Defendant Barnes changed Plaintiff's job duties, informed her she would no longer conduct investigations in the field or serve subpoenas, began taking away Plaintiff's cases and reassigning them, and other retaliatory actions. Plaintiff claims she began to fear her job was in jeopardy. The First Amendment does not provide citizens the right to be employed; however, if employees are not likely to exercise their First Amendment right to speak because they think they will be terminated in retaliation for speaking, then protected speech of the employees is "likely deter[red]." *Woodruff*, 542 F.3d at 551.

Plaintiff also supports her assertion that there is a causal link between her protected speech and the retaliatory deprivation. Plaintiff explains that after *The Pantagraph* published the story about the alleged misconduct in the Boswell trial, Defendant Barnes spoke to Plaintiff about the matter and was concerned it would negatively impact her political future. It was after this discussion that Plaintiff claims she experienced adverse employment actions by Defendant Barnes. She provides affidavits from colleagues that support her claim that her personal and professional relationship with Defendant Barnes became tense and that Defendant began to scrutinize Plaintiff's work and curtail her ability to do her job. ECF Nos. 46-1; 46-2; 46-3. Attorney Jennifer Patton

specifically stated that in early 2016, Defendant's demeanor towards Plaintiff changed. ECF No. 46-1. Patton testified that Defendant began making comments about how Plaintiff was not in the office much even though her job as an investigator required that she be out of the office much of the time to meet witnesses and visit people. *Id*. Defendant began asking about how much work Plaintiff did and, in the spring of 2016, Defendant demanded that attorneys get her approval before Plaintiff could work on a case. *Id*.

Susan Thomas, the former social worker for the public defender's office, also confirmed that Plaintiff and Defendant's relationship changed "almost overnight" sometime after their February 2016 vacation. ECF No. 46-2. She claims that Defendant began to assign her some of Plaintiff's duties, including serving subpoenas and locating witnesses. Thomas witnessed Plaintiff reporting her time to a legal assistant while Thomas was never required to keep track or report her time, either in the office or out of the office. Thomas also testified that she was not aware of anyone else in the office being required to track their time. *Id.* Accordingly, it appeared that Plaintiff was being singled out.

When Plaintiff began assisting Boswell's new criminal defense attorney in early 2017, Plaintiff claims that Defendant complained that she was not happy about the amount of time Plaintiff was spending with Boswell's new criminal defense lawyer and that she would speak to the lawyer about not taking so much of Plaintiff's time. ECF No. 46 at 24. Plaintiff was apparently worried Defendant would interfere and immediately called Boswell's attorney to assure him that she wished to continue to assist him. *Id*. Plaintiff considers this another act protected under the First Amendment that prompted further retaliation from Defendant.

Additionally, without any input from the attorneys in the office or even consulting Jennifer Patton, the First Assistant Public Defender, who should have had input, Defendant eliminated

Plaintiff's job. Although Defendant did not ask, Patton offered that she thought Plaintiff's position was essential. ECF No. 46-1. Patton further thought that there were a number of legal assistants in the front office who appeared to have a lot of free time during the day while Plaintiff was busy. *Id*. Even the social worker claims that she was even shocked that it was not her position that was eliminated instead of Plaintiff's job given that her position was not utilized as often. ECF No. 46-2.

Based upon Plaintiff's interpretation of events, Defendant then later attempted to hide her retaliatory behavior by erroneously claiming Wesson had the final decision about eliminating Plaintiff's position and testifying that she had conversations with attorneys about whether to eliminate the social worker position instead. Plaintiff notes that in Defendant's answers to interrogatories, Defendant claimed that Wasson "ultimately recommended selecting the position of Investigator from the 2018 budget with input from Defendant." ECF No. 45-5 at 3. As Plaintiff sees it, Wesson contradicted Defendant in his deposition, stating that he accepted Defendant's recommendation about which position to eliminate. ECF No. 45-13 at 13–14. After Wesson had been deposed, Defendant acknowledged during her deposition that she recommended that Plaintiff's position be eliminated. ECF No 46-1. Attorneys in the office also deny that Defendant ever seriously considered eliminating the social worker position. Patton also stated in her affidavit that in the summer of 2020, Defendant called her to ask whether Patton remembered a conversation from 2017 about offering Plaintiff the contract position and told her that Wasson made the decision to eliminate Plaintiff's position over the social work position. Patton denied that they ever discussed offering Plaintiff the contract job and had assumed Defendant was eliminating Plaintiff's position because she wanted Plaintiff gone. ECF No. 46-1. As the Seventh Circuit has stated "a changed story is evidence of pretext." *Zaccagnini v. Chas. Levy Circulating Co.*, 338 F.3d 672,

678 (7th Cir. 2003). Plaintiff has presented evidence that Defendant has changed her story and attributes that to Defendant's desire to hide her retaliatory behavior.

As further proof of retaliatory animus, Plaintiff points to the fact that Defendant did not offer Plaintiff the contractor position, given Plaintiff's stellar performance reviews, history with the office, and experience. Attorney Brian McEldowney stated that he thought Plaintiff would have been the obvious choice for the contractor role but was unsurprised Defendant did not offer Plaintiff the job given the strained relationship between Plaintiff and Defendant. ECF No. 46-3. Plaintiff also points out that Defendant then insisted Plaintiff immediately pack up her office and leave on December 18, when Plaintiff declined the Office Support Specialist role that was offered to her. Plaintiff explained in her deposition that several co-workers helped her gather her belongings, load up her car, and then later brought her additional items from her office because Plaintiff was not prepared to leave her long-time position knowing she was funded through the end of the year. ECF No. 45-1 at 27. Defendant introduced Plaintiff's replacement later that day and Plaintiff did not return to the office despite December 31 officially being her last day. *Id.*

### ii.    Defendant's explanations are not sufficient to remove this issue from a jury.

Defendant Barnes has a much different interpretation of the events that occurred after *The Pantagraph* article. Defendant does not dispute that Plaintiff told her about Campbell's statement that she helped the Assistant State's Attorney write her closing argument. ECF No. 50 at 7. Defendant further admits that she told Plaintiff she was not pleased with Campbell but was not going to act. *Id.* The parties further agree that Defendant told Plaintiff that she discussed Campbell's statement with co-counsel Brian McEldowney that same day and they decided that they did not need to report the information. However, McEldowney states in a sworn affidavit that the conversation did not take place and that he was unaware that Plaintiff believed Campbell

assisted the State's Attorney in the case at the time. ECF No. 46-3 at 4. He claims that the first time Defendant came to discuss the issue was many years after the fact in the summer or fall of 2020 when Defendant asserted that she told him about Campbell's statements when it happened. *Id*. He further informed Kevin Sanborn, Boswell's attorney that he did not know about Campbell's statements and that he may be called to testify at trial. *Id*.

Defendant also claims that her relationship with Plaintiff and others in the office naturally shifted after she became the supervisor. She appears to agree that she and Defendant were not as close, but attributes that shift to her new demanding job and her position of authority over Plaintiff. She also suggests that her desire to keep closer tabs on Plaintiff were related to safety concerns and accountability. She thought it was important that the office know where Plaintiff was if anything happened, and she thought Plaintiff should account for her whereabouts during work hours. While Defendant Barnes may present her side of the story to the jury, Plaintiff has provided affidavits and deposition testimony to support her version of the facts. According to Plaintiff and others in the office, Plaintiff and Defendant remained close friends long after Defendant became a supervisor. The two even vacationed in Punta Cana together in February 2016, a month before *The Pantagraph* article. *See* ECF No. 46-2. Plaintiff further provides support for her position that it was *The Pantagraph* article that prompted the more tense relationship, and that Defendant did not monitor others while they were out of the office in the same way she began to monitor her.

Defendant also argues that Plaintiff was offered another job with the county. Plaintiff acknowledges that she was offered to transfer to the open position of Office Support Specialist I in the clerk's office but suggests that it was a dead-end job that was not in her field of work. Plaintiff stated in her deposition that she would not have been eligible for any more raises in that position and that ultimately her overall pension would be reduced. ECF No. 45-1 at 48. Plaintiff

further argues that she was a licensed private investigator and the duties of the position in the clerk's office were entirely different than that of a private investigator.

Even if the Court were to construe this offer of an alternative position to mean that Plaintiff was not, in fact, terminated, adverse employment actions can also include reassignment to a position with significantly different job responsibilities, or an action that causes a substantial change in benefits. *See Rhodes v. Illinois Department of Transportation,* 359 F.3d 498, 504 (7th Cir. 2004) ("an adverse employment action is a significant change in the claimant's employment status"); *Traylor v. Brown*, 295 F.3d 783, 788 (7th Cir. 2002), ("[a] materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation."). Petitioner was a licensed professional and after she was informed that her position was eliminated, the state offered a position in a different office outside her field of work with no promotional opportunity. Even if the Court were to agree that this was no longer technically a termination, a reasonable jury could find that the transfer to the Support Specialist role was an adverse action.

Finally, Defendant also suggests that she made a wise financial decision for the office in contracting out Plaintiff's position since the county continues to utilize a contractor and pays significantly less for the contractor services. Attorney Jennifer Patton explained that it is much more difficult to work with the current contract investigator because unlike Plaintiff, Patton must sit him down and explain clearly what she needs from him. ECF No. 46-4 at 4. Patton said that Plaintiff was a great investigator who knew what was needed without Patton having to spell it out for her. *Id*. Accordingly, Patton does not use the contractor position as much. *Id*. Patton also claims that in the front office there were four legal assistants, an office manager, and another individual

who was either a paralegal or assistant. Patton observed that the assistants frequently had free time during the day and that cutting a legal assistant position would not have negatively impacted her ability to do her job in the same way that removing Plaintiff's position did. *Id*. at 5. Attorney Brian McEldowney also confirmed that the office was better when Plaintiff was part of the office and that Plaintiff uncovered information through her investigation that attorneys would not have gotten on their own, resulting in many cases being dismissed or charges reduced. ECF No. 46-2 at 2. Susan Thomas, the social worker, claims she was shocked that Plaintiff's position was terminated instead of her job. ECF No. 46-2. That Plaintiff's position remains unfilled does not necessarily confirm that Defendant's decision was free from retaliatory animus.

**B. Defendant is not entitled to protection from the Tort Immunity Act.**

Defendant also argues that she is entitled to immunity from Plaintiff's state law claim that Defendant violated the Illinois Whistleblower Act. As Defendant argued in her motion to dismiss, she again contends that Plaintiff's Whistleblower Act claim is barred by several provisions of the Illinois Local Governmental and Governmental Employees Tort Immunity Act ("Tort Immunity Act"), which immunizes municipalities and its employees from liability for the performance of acts that are discretionary and involve policy determinations. The Tort Immunity Act states in pertinent part:

> Except as otherwise provided by statute, a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused.

745 ILCS 10/2-201; *see also* 745 ILCS 10/2-205. Illinois courts have determined that this provision, when analyzed in conjunction with immunity for government entities under 745 ILCS 10/2–109, also immunizes municipalities for officials' discretionary policy decisions. *Murray v.*

13

*Chi. Youth Ctr.*, 864 N.E.2d 176, 186 (Ill. 2007) ("[S]ection [2–201], together with section 2–109 . . . provides both public employees and the public employer with immunity against allegations that challenge discretionary policy determinations."). Additionally, "an employee may be granted immunity if he holds either a position involving the determination of policy or a position involving the exercise of discretion." *Harinek v. 161 N. Clark St. Ltd. P'ship*, 692 N.E.2d 1177, 1181 (Ill. 1981). However, "immunity will not attach unless the plaintiff's injury results from an act performed or omitted by the employee in determining policy and in exercising discretion." *Id*.

To determine whether the Tort Immunity Act applies in this case, the Court must examine whether Defendant discharged her in a manner involving a determination of policy and an exercise of discretion. *Id*. Policy determinations are those acts that require the balancing of competing interests to make a judgment as to what solution will best serve those interests. *Id*. Moreover, discretionary acts are unique to a particular public office and involve the exercise of judgment. *Corning v. East Oakland Tp*., 670 N.E.2d 350, 352 (Ill. 1996). In particular, decisions of hiring and firing are discretionary acts under Section 2–201 of the Tort Immunity Act. *See Johnson v. Mers*, 664 N.E.2d 668, 675 (Ill. 1996) (defining discretionary acts as those "not performed on a given state of facts in a prescribed manner," and in particular describing hiring as a discretionary act). Likewise, the decision to fire someone involves balancing a set of given circumstances to arrive at an appropriate outcome; the outcome is not predetermined but left in the hands of an official to use proper judgment. *See Zinnermon v. City of Chicago Dept. of Police*, 209 F. Supp. 2d 908, 911 (N.D. Ill. 2002).

Crediting Plaintiff's version of the facts, Defendant Barnes was not balancing competing interests when she allegedly retaliated against Plaintiff for speaking out on matters of public concern by limiting Plaintiff's job duties and eliminating her job after Plaintiff's accusations that

Defendant was involved in professional misconduct gained public attention and Plaintiff began cooperating in Boswell's post-conviction hearings. The provision of the Whistleblower Act alleged by Plaintiff prohibits employers from retaliating against an employee "because of the employee disclosing or attempting to disclose public corruption or wrongdoing." 740 ILCS 174/20.1. In this case, Plaintiff disclosed information she believed to be illegal to the Attorney General's office and to Chief Judge Robb. The Seventh Circuit has held that an employer who fired an employee after she exposed corrupt practices was not immune from retaliatory discharge under the Tort Immunity Act, because the employer failed to establish that he had made a policy decision. *See generally Valentino v. Village of South Chicago Heights*, 575 F.3d. 664, 679 (7th Cir. 2009). Here, Defendant Barnes has failed to establish that she made a policy decision that resulted in a discretionary determination to eliminate Plaintiff's position. Instead, Plaintiff has supported her position that Defendant's actions were retaliatory.

## CONCLUSION

Because the Court cannot say that no reasonable jury could conclude that Defendant's explanations for choosing to terminate Plaintiff are a pretext for retaliation, the Court must deny Defendant's Motion for Summary Judgment. Plaintiff has adequately supported her claims of a First Amendment violation under 42 U.S.C. § 1983 and violation of the Illinois Whistleblower Act, 730 ILCS 174/20.1 with sworn testimony, and thus, Plaintiff is entitled to have a jury decide the disputed issues of fact that this case presents. Accordingly, Defendant's Motion for Summary Judgment [45] is DENIED.

ENTERED this 12th day of October, 2021.

/s/ Michael M. Mihm
    Michael M. Mihm
United States District Judge